# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

October 13, 2015

Lyle W. Cayce
Clerk

No. 14-51098

KYANA FENNELL, as Next Friend of Kyrianna Adams Fennell and Kavin Johnson; LAWANDA FENNELL-KINNEY, as Next Friend of Kyrianna Adams Fennell and Kavin Johnson,

       Plaintiffs - Appellants

v.

MARION INDEPENDENT SCHOOL DISTRICT; GLENN DAVIS, Individually and in his Official Capacity as Former Athletic Director of Marion High School; CYNTHIA MANLEY, Individually and in her Official Capacity as a Former Coach at Marion High School,

       Defendants - Appellees

_____

Appeal from the United States District Court
for the Western District of Texas

_____

Before KING, DENNIS, and OWEN, Circuit Judges.

KING, Circuit Judge:

      Plaintiffs–Appellants Lawanda Fennell-Kinney and Kyana Fennell, on behalf of Kyrianna Adams Fennell and Kavin Johnson, brought claims under Title VI of the Civil Rights Act of 1964 and 42 U.S.C. § 1983 against Marion Independent School District and two of its employees, Glenn Davis and Cynthia Manley. The district court granted Defendants–Appellees' motion for summary judgment as to all claims, and Plaintiffs appeal.

No. 14-51098

# I.    FACTUAL AND PROCEDURAL BACKGROUND

Lawanda Fennell-Kinney is the mother of sisters Kyana Fennell, Kyrianna Adams Fennell (Kyra), and Kavin Johnson, who were ages 18, 15, and 13, respectively, when this action was filed in 2012. Plaintiffs, who are African-American, claimed that Marion Independent School District (Marion ISD) and two Marion ISD employees, Glenn Davis and Cynthia Manley, discriminated against them on the basis of race and created a racially hostile educational environment. Plaintiffs' claims stem from a series of incidents that took place while Kyana, Kyra, and Kavin were enrolled in Marion ISD, a predominately Caucasian school district.[1] We recount the relevant incidents below, organized by the nature of the harassment involved.

## A. Incidents Involving Nooses

In February 2012, Fennell-Kinney drove to the Marion High School parking lot to retrieve a car seat from Kyana's car. Next to the car, Fennell-Kinney found a noose and a printed note, which stated:

Die Fuckin "nigger sisters" . . . Bitches!!!!

You can never bring our families down . . .

Whites will always rule this town and school!!!!

Damn Spooks!!!!

So go ahead and file your stupid damn complaints and grievances . . .

NIGGERS . . . and that "Nigger Lover" you have a baby with . . .

Fennell-Kinney immediately reported this incident to the Marion High School assistant principal, and Kyana told the assistant principal her suspicions that one of her classmates may have been involved. The assistant principal told Fennell-Kinney that he would review the parking lot surveillance tapes. He

---

[1] These facts are recounted in the light most favorable to Plaintiffs, the non-moving party. *United Fire & Cas. Co. v. Hixson Bros.*, 453 F.3d 283, 285 (5th Cir. 2006).

No. 14-51098

subsequently reported the incident to Officer Haverstock, a police officer for the City of Marion who patrolled the school.

Officer Haverstock began investigating after Kyana signed an Affidavit of Prosecution. Haverstock interviewed several school employees as well as every student Kyana suspected was involved in the incident. Haverstock also reviewed the surveillance footage, which did not show the area of the parking lot where the noose and note were found. One week after the incident, Kyana signed an Affidavit of Non-Prosecution, indicating that she no longer wished to pursue charges because the investigation and its backlash were causing her stress and she did not trust the Marion Police Department. The police department suspended its investigation, and the Federal Bureau of Investigation took over investigating the incident.[2]

This was not the first incident involving a noose at the high school. The previous year, Doug Giles, another African-American student, found a noose made out of a shoelace in his locker. Giles reported the incident to Defendant Davis, who then addressed the boys athletic class, telling them that such actions were unacceptable and would not be tolerated. When no one admitted his involvement in the incident, Davis ordered the students to run laps as punishment. Davis also informed the interim superintendent of Marion ISD about the incident.[3]

### B. Incidents Involving Racial Epithets and Slurs

During their time in Marion ISD, Plaintiffs were the target of racial epithets and slurs. The earliest events began in kindergarten when Kyana was called a "nigger" by a boy on the school bus. Kyana responded by punching the boy, for which she was disciplined. Kyana reported the boy's statement to

---

[2] The case presently remains open and unsolved.
[3] Doug Giles was a ward of Fennell-Kinney at the time, but no one at the school informed Fennell-Kinney about the incident.

the bus driver, but it is unclear whether the boy was also disciplined.[4] After Kyana's class read *Huckleberry Finn* in middle school, some of the students started using the word "nigger" outside the context of the book. Kyana reported this to her teacher, and the teacher then spoke to the class about the incident, making clear that the word should not be used outside of discussions of the book. Kyra received a text message from a classmate referring to her as a "stupid nigger" after the 2008 presidential election. Kyra reported the incident to her middle school principal, who suspended Kyra's classmate after explaining the inappropriate nature of the comment.

Other students continued to target Plaintiffs with offensive remarks in the years immediately preceding this litigation. During the 2009–2010 school year, a Caucasian student called Kyana a "stupid nigger." Kyana reported the incident to the principal, who then contacted the student's mother and explained that the student had been told not to use such language. It is unclear whether the student received any additional punishment.

In February 2011, a group of students surrounded Kavin. One of the Caucasian students hit Kavin and called her a "nigger." Kavin then punched the aggressor. After meeting with the two separately, the middle school principal suspended both Kavin and the aggressor for three days.[5] The other student called Kavin a "nigger" a week later, which Kavin reported to the principal. It is unclear whether the principal took any disciplinary action

---

[4] Plaintiffs contend that no action was taken against the boy, but the evidence cited by Plaintiffs shows only that Kyana did not know whether any action was taken. It is also unclear whether the bus driver reported this incident to anyone at Marion ISD.

[5] Plaintiffs assert that the school district took no action against Kavin's attacker and the other aggressors. However, the evidence cited by Plaintiffs indicates only that no charges were pressed against the girls due to the time period that had passed. The record clearly indicates that both Kavin and the aggressor were suspended for the fight, which Plaintiffs later conceded.

No. 14-51098

against the student in response to this second incident.[6]  In another instance, a Caucasian classmate told a joke in class using the word "nigger."  In response, the teacher told Kavin that the student "didn't mean it like that."  Kavin reported the incident to the principal, who called the student's mother.[7]  After the noose was found near Kyana's car in February 2012, high school students began yelling at Kavin and called her names, including "nigger," as she walked from the middle school to the high school for band practice.  After Kavin complained, the assistant principal assigned a teacher's aide to accompany Kavin during the walk each day.  Kavin was also called "Blackie," "Black girl," and "stupid little Black girl" by her peers on other occasions.[8]

In April 2012, the softball team took a team photo without Kyra present. In the photo, one of the girls was in a shadow, and several of Kyra's softball teammates joked that the "black girl" was Kyra, cropped into the photo.  Kyra later learned of these comments, but she did not report them to Marion ISD.

Individuals other than the sisters also experienced name-calling in Marion ISD.  In February 2012, Giles heard a Caucasian classmate use the word "nigger" in a conversation with someone else.  After a verbal confrontation over the classmate's use of the word, Giles initiated a physical altercation by throwing a basketball at the student.  The assistant principal told the student not to use racial slurs, spoke to the student's parents about the incident, and suspended the student for two days for using the racial slur.

---

[6] Kavin declared she did not know what action the middle school principal took in response, but in another portion of the deposition, Kavin indicated that she may not have reported the incident at all.

[7] Plaintiffs contend that no further disciplinary action was taken against the student or the teacher, but the evidence cited in support indicates only that Kavin did not know whether further action was taken.

[8] Plaintiffs assert that no action was taken in response to these incidents, but the evidence cited by Plaintiffs does not indicate whether these incidents were reported to Marion ISD, nor does the evidence indicate what actions, if any, were taken in response.

No. 14-51098

The assistant principal also suspended Giles for two days for escalating the incident into a physical fight. Similarly, Daryl Kinney testified that his son, who attended school at Marion ISD for a year, was called "black boy" and "nigger," and ultimately withdrew from the district because of the racial slurs.

### C. Incidents Involving Defendants Davis and Manley

In early 2011, Kyana had a hairstyle with streaks of burgundy in her hair.[9] Defendant Davis, the Athletic Director, admonished Kyana for the hairstyle. Davis told Kyana, "I know how much you people spend on your ethnic hair styles" and asked Kyana "why [she] wanted to bring attention to [her]self." Davis noted that the Marion ISD student dress code and the athletics policy manual prohibited students from having their hair in non-naturally occurring colors, including burgundy. Kyana was aware of and had signed this policy. Davis informed Kyana that she would have to change her hair color before she could continue playing sports. Kyana eventually re-colored her hair. Davis, another coach, and the assistant principal had all admonished other students, including Caucasian and Hispanic students, that the students' hair coloring violated school policies. Davis and the other coach had also told the students that they would need to cut or re-dye their non-naturally occurring hair before they could participate in school athletic activities.[10]

On April 17, 2012, the Marion girls' varsity softball team, coached by Defendant Manley, had an away game in Luling, Texas. Kyra was the starting

---

[9] No one else in the school during this time had a similar hair style. The assistant principal had previously reprimanded Kyana for her hair color during the 2008–2009 school year. After meeting with Fennell-Kinney, the assistant principal allowed Kyana to keep her hair until her next hair appointment, although Kyana had to hide the coloring.

[10] Plaintiffs assert that other Caucasian students who wore their hair in non-naturally occurring shades were not similarly admonished, but the evidence cited in support of this proposition establishes only that Fennell-Kinney was aware that some other students at the school had such hairstyles, not that those students were not reprimanded for their hair.

No. 14-51098

shortstop on the team. Earlier that day, Kyra left school, with permission, after a heated argument with several other students. Kyra went to lunch with Kyana and family friends. Kyana returned to school, but Kyra remained with the family friends for the rest of the afternoon. Since Kyra was off campus with family friends, she was absent when Manley took roll in Kyra's last period athletics course. After taking roll, the members of the softball team in the class boarded the team bus, and the bus left for the away game. Kyra returned to campus prior to the scheduled departure time for the bus, but the bus was already leaving. The driver of the car Kyra was riding in waved and honked at the bus to get Manley's attention, but Manley did not see Kyra in the vehicle and continued driving. Kyra followed the bus to the Luling game. When she arrived, Manley told Kyra she could not start but could play later in the game. Thereafter, Fennell-Kinney arrived at the game to take Kyra home. Manley informed Fennell-Kinney and Kyra that Kyra would be benched for the next game if she left the game early. After a verbal confrontation between Fennell-Kinney and Manley, Fennell-Kinney and Kyra left.

Two days later, after hearing that two other students had stated that Kyana, who had a child, was a bad parent, Kyana confronted the students at the softball field. During the verbal altercation,[11] one of the students asked Kyana "[w]hat are you going to do, kick my ass?" to which Kyana responded, "[y]es, if you want me to." Several students reported the incident to Manley, who intervened after the verbal altercation had ended. She told the students to leave each other alone and to go home. Kyana then drove away. After Kyana left, the other students involved in the altercation expressed to Manley that they were afraid of Kyana. Manley instructed the students that they could file

---

[11] The other students claim that Kyana physically pushed them, but this fact is disputed by Kyana.

a police report regarding the incident. Manley had never previously advised any of her players to report an incident to the police. The students ultimately filed charges against Kyana, which were later dismissed. Davis wrote an incident report to the interim superintendent and to the Marion ISD School Board regarding the altercation. Davis concluded, based on Manley's account, that Kyana bullied the other two students.

### D. Other Incidents of Harassment

Plaintiffs were also harassed in other ways. In 2008,[12] Kyra received a text message from a Caucasian classmate that showed an animation of KKK members chasing President Obama. Kyra and the classmate had a physical altercation, and both students received three-day suspensions following the incident.[13] In 2010, one of Kyra's teachers told Kyra's class that "all black people [are] on welfare." Kyra confronted the teacher about the statement, after which the teacher threatened to send her to the office if she "didn't pipe down." Kyra did not report the incident to anyone else at the school.

During the 2011–2012 school year, the girls' final school year in Marion ISD, the harassment continued. Kyana attended a basketball game with a friend, who joked that two other girls were "bad influences" for cheating. Ashley Smith, a Caucasian teacher who coached Kyana on the basketball team, overheard the conversation and told Kyana: "You're the bad influence. You're the one who had a kid at 17."[14] Smith was suspended from coaching for one

---

[12] That year, Fennell-Kinney also filed a grievance against one of Kyana's teachers for stating that Kyana was not intelligent enough to complete the work in his class. That grievance was ultimately resolved.

[13] Although Plaintiffs assert that no action was taken against the classmate regarding the incident, the evidence cited to support this proposition does not mention whether any action was taken against the white classmate. In other portions of the record, Kyra stated that the classmate received the same punishment as she did.

[14] Plaintiffs contend that Smith "has never been heard to make such comments to her white students, regardless of what problems or trouble they may have experienced." The evidence cited to support this assertion, however, shows only that the deponent could not

No. 14-51098

game and given an official reprimand from the school's athletic director. A letter regarding the incident was also placed in Smith's file. The incident prompted Fennell-Kinney to file a grievance with the school administrators. Following the incident, Kyana was also harassed by her peers at school for getting Smith into trouble.

Kavin tried out for the cheerleading squad, which prompted her peers to say that "Black girls [aren't] pretty enough to be cheerleaders." In addition, several girls recorded her tryouts on their cell phones, spreading the video around the school with the title: "Little boy tries out for cheerleading." Although Fennell-Kinney reported to the cheer sponsor (a teacher) that some of the girls had recorded Kavin's tryout, it does not appear that any of the other comments were reported to anyone at Marion ISD. Kavin was also involved in an altercation in which a Caucasian male student spat in her face and told her to "go back where you came from." Kavin reported the incident to the principal, who talked to the student about the incident.[15]

Kyra complained to the assistant principal regarding Facebook posts from several of her classmates calling her a "bitch" and a "self-centered bitch." The classmates also complained to the assistant principal about Kyra's posts. The assistant principal told Kyra that he could not punish any of the girls for this conduct because it occurred outside of school.

---

recall if Smith had previously coached students that had become pregnant while on one of her teams.

[15] The record contains no evidence whether any additional action was taken against the student, contrary to Plaintiffs' suggestion.

No. 14-51098

**E. Marion ISD Policies and Response to Complaints**

During the time period relevant to the lawsuit, Marion ISD had in place policies prohibiting harassment, bullying, and racial discrimination. These policies are contained in the District Employee Handbook and in the Student Handbook. Marion ISD also required its employees to attend in-service training at the beginning of each school year; that training addressed issues of bullying, discrimination, and harassment prevention and reporting.

Marion ISD provided Kyana with alternative accommodations after the parking lot noose incident and other incidents. Because of these incidents, Kyana began suffering from anxiety and believed that some teachers were not treating her fairly. The school allowed Kyana to complete her schoolwork in the counselor's office because of her anxiety. The accommodations also allowed Kyana to park in the teachers' parking lot and to eat lunch with teachers with whom she felt comfortable.

As a result of the above incidents, Fennell-Kinney filed a Level Three grievance before the Marion ISD Board of Trustees (Board), which was presented to the Board on May 30, 2012.[16] The district granted some of the remedies requested by Plaintiffs and denied others.[17] Marion ISD also required its employees to attend additional training on its discrimination, harassment, and bullying policies after the noose was found in the parking lot. The training was facilitated by the Department of Justice (DOJ) and provided by an outside organization, which was not affiliated with the district. Students were also required to attend a special assembly led by the same organization

---

[16] Fennell-Kinney had previously filed Level One and Level Two grievances before school administrators and the Marion ISD superintendent, respectively. One of the board members recused himself from the Level Three proceedings due to any potential bias the member might have had against Plaintiffs.

[17] Although the district's response to the Level One and Level Two hearings are in the record, the response to the Level Three hearing does not appear in the record.

No. 14-51098

on the same topics. The district, however, refused to sign a resolution provided by the DOJ regarding the school's policies.[18]  Fennell-Kinney ultimately withdrew Kavin and Kyra from Marion ISD in the spring of 2012 and enrolled the sisters in another school district.[19]

Plaintiffs filed their original complaint on October 4, 2012. The district court ordered several claims dismissed with prejudice, and on March 14, 2013, Plaintiffs filed their Second Amended Complaint. The Second Amended Complaint alleged equal protection claims under 42 U.S.C. § 1983 against Manley and Davis, in their individual capacities, and Marion ISD, and a Title VI claim against Marion ISD.[20]  After discovery, Defendants moved for summary judgment. On August 28, 2014, the district court granted summary judgment as to all the claims. Plaintiffs timely appeal.

## II.    STANDARD OF REVIEW

We review a grant of summary judgment *de novo*, applying the same standard as the district court. *Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court views the evidence "in the light most favorable to the nonmoving party." *Cuadra*, 626 F.3d at 812. "We may affirm a summary judgment on any ground supported by the record, even if it is different from that relied on by the district court." *Pierce v. Dep't of U.S. Air Force*, 512 F.3d 184, 186 (5th Cir. 2007) (quoting *Lozano v. Ocwen Fed. Bank, FSB*, 489 F.3d 636, 641 (5th Cir. 2007)).

---

[18] The exact nature of the resolution is unclear.

[19] The 2011–2012 school year was Kyana's senior year, and she graduated from Marion High School after the 2012 spring semester.

[20] The Second Amended Complaint also alleged an equal protection claim under 42 U.S.C. § 1983 against Coach Smith, but the district court dismissed that claim with prejudice for failing to state a claim.

No. 14-51098

## III.   RACIAL DISCRIMINATION UNDER TITLE VI

On appeal, Plaintiffs argue that summary judgment was improper because a genuine dispute of material fact existed as to their Title VI claim against Marion ISD.  Section 601, Title VI, of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[21]   42 U.S.C. § 2000d; Civil Rights Act of 1964, Pub. L. No. 88-352, § 601, 78 Stat. 241, 252.  Private individuals can bring suit "to enforce § 601 of Title VI."  *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001).  However, Section 601 "prohibits only *intentional* discrimination." *Id.* at 280, 285, 293 (emphasis added).  Accordingly, "[t]o receive compensatory damages, a Title VI plaintiff must prove discriminatory intent."  *Canutillo Indep. Sch. Dist. v. Leija*, 101 F.3d 393, 397 (5th Cir. 1996).

This court has yet to address a Title VI claim premised on a racially hostile environment arising from student-on-student harassment.  One circuit has adopted a three-element framework, based on a Department of Education investigative guidance notice.  *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1032–33 (9th Cir. 1998) (citing Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance, 59 Fed. Reg. 11,448, 11,449 (Mar. 10, 1994)).  One year after *Monteiro*, however, the Supreme Court held that a recipient of federal funding can be liable for student-on-student sex-based harassment *under Title IX* if the recipient was deliberately indifferent.  *Davis ex rel. Lashonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).  Since *Davis*, courts of appeals presented with Title VI student-on-student harassment claims have applied the deliberate

---

[21] It is undisputed that Marion ISD received federal financial assistance.

No. 14-51098

indifference standard from *Davis*, rather than the *Monteiro* framework. *See, e.g.*, *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 272–73 (3d Cir. 2014); *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664–65 (2d Cir. 2012); *Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cty.*, 334 F.3d 928, 934 (10th Cir. 2003).

We agree that the correct analytical framework for a Title VI student-on-student harassment claim is the deliberate indifference standard. While *Davis* dealt with sex-based peer harassment under Title IX, *Davis*, 526 U.S. at 636–38, "Congress modeled Title IX after Title VI . . . and passed Title IX with the explicit understanding that it would be interpreted as Title VI was." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009). As the Tenth Circuit recognized, "the [Supreme] Court's analysis of what constitutes intentional sexual discrimination under Title IX directly informs our analysis of what constitutes intentional racial discrimination under Title VI (and vice versa)." *Bryant*, 334 F.3d at 934; *see also Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014). Furthermore, this court has previously noted the similarities between Title VI, Title IX, and 42 U.S.C. § 504 when it extended the deliberate indifference standard from *Davis* to § 504 claims. *Estate of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 995–96 (5th Cir. 2014).

Therefore, under Title VI, we apply the deliberate indifference standard to claims of liability arising from student-on-student harassment.[22] A school district receiving federal funds may be liable for student-on-student harassment if (1) the harassment was "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to educational opportunities or benefits provided by the school" (a racially hostile

---

[22] While the district court facially adopted the *Monteiro* three-element framework in its summary judgment analysis of the Title VI claim, the district court also incorporated *Davis*'s deliberate indifference standard within that same analysis.

No. 14-51098

environment), and the district (2) had actual knowledge, (3) had "control over the harasser and the environment in which the harassment occurs," and (4) was deliberately indifferent. *Davis*, 526 U.S. at 644, 650; *accord Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011).[23] Here, the parties dispute only whether a racially hostile environment existed and whether the school district was deliberately indifferent to that environment.[24] We address each issue in turn.

## A. Racially Hostile Environment

Plaintiffs have raised a genuine dispute that a racially hostile environment existed. For the harassment to be "severe, pervasive, and objectively offensive," *Davis*, 526 U.S. at 650, "the harassment must be more than the sort of teasing and bullying that generally takes place in schools," *see Sanches*, 647 F.3d at 167 (analyzing harassment in the Title IX context). There is no question, though, that repeatedly "being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, [and] being shamed and humiliated on the basis of one's race" is harassment far beyond normal schoolyard teasing and bullying. *Monteiro*, 158 F.3d at 1034. Moreover, the use of a noose accompanied by a vitriolic and epithet-laden note only underscores the severe, pervasive, and objectively offensive nature of the harassment. *See Porter v. Erie Foods Intern., Inc.*, 576 F.3d 629, 635–36 (7th Cir. 2009) (discussing the historical meaning and power of noose imagery). The harassment faced by Giles and Daryl Kinney's son also points toward a racially hostile environment. *See Monteiro*, 158 F.3d at 1033 ("[R]acist attacks need

---

[23] This court has expressly included an additional element for Title IX student-on-student harassment claims: the harassment was based on the victim's sex. *Sanches*, 647 F.3d at 165. The corollary requirement under Title VI would be that the harassment was based on the victim's "race, color, or national origin." *See* 42 U.S.C. §2000d.

[24] Since we hold that Plaintiffs have failed to raise a genuine dispute that Marion ISD was deliberately indifferent, we need not address the undisputed elements.

No. 14-51098

not be directed at the complainant in order to create a hostile educational environment.").

Marion ISD contends that the harassment by fellow students was too periodic and sporadic to constitute a racially hostile environment. It argues that the harassment must be "more than episodic; [it] must be sufficiently continuous and concerted" to constitute "pervasive" harassment. *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003) (quoting *Carrero v. N.Y.C. Hous. Auth.*, 890 F.2d 569, 577 (2d Cir. 1989)). While *Hayut* held that biweekly comments over the course of one semester "were sufficiently pervasive to create a hostile environment," *id.* at 746, the Second Circuit has also held that much less regular name-calling raised a triable issue of fact. *See DiStiso v. Cook*, 691 F.3d 226, 243 (2d Cir. 2012) (noting that use of the word "nigger" approximately eight to fifteen times over a single school year raised a question of whether the name-calling was severe or pervasive). Furthermore, this court has held that racially offensive remarks made every few months over three years was sufficient to raise a genuine dispute of whether a hostile environment exists under Title VII. *See Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000), *abrogated on other grounds*, *Burlington Northern & Sante Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Viewing the evidence in the light most favorable to Plaintiffs, the racially offensive remarks and actions, especially in the two to three years immediately before this litigation, were sufficiently regular and continuous to constitute "severe, pervasive, and objectively offensive" harassment. *Davis*, 526 U.S. at 650.

Moreover, this harassment "deprive[d Plaintiffs] of access to the educational opportunities or benefits provided by the school." *Id.* The harassment must have a "concrete, negative effect" on the victims' education, *id.* at 654, such as creating "disparately hostile educational environment

No. 14-51098

relative to [the victim's] peer,"[25] forcing the student to change his or her study habits[26] or to move to another district,[27] or lowering the student's grades.[28] Here, Kyana suffered from anxiety and required alternative study arrangements, while Kyra and Kavin were ultimately withdrawn from Marion ISD and moved to another district. These facts are sufficient to raise a genuine dispute that Plaintiffs were deprived of educational opportunities by the "severe, pervasive, and objectively offensive" harassment at Marion ISD.

## B. Deliberate Indifference

However, Plaintiffs have failed to raise a genuine dispute over whether the school district was deliberately indifferent to the harassment. Noting the "flexibility [school administrators] require," the Supreme Court in *Davis* explained that a school district should be "deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* at 648. Mere negligence will not suffice. *Id.* at 642; *see also Sanches*, 647 F.3d at 167 ("[Deliberate Indifference] is a high bar, and neither negligence nor mere unreasonableness is enough."). Accordingly, "[o]fficials may avoid liability under a deliberate indifference standard by responding reasonably to a risk of harm, 'even if the harm ultimately was not averted.'" *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 220 F.3d 380, 384 (5th Cir. 2000) (quoting *Farmer v. Brennan*, 511 U.S. 825, 844 (1994)).

The evidence here, even viewed in the light most favorable to Plaintiffs, fails to raise a genuine dispute that Marion ISD's responses to these incidents were clearly unreasonable. Here, Marion ISD took some action in response to

---

[25] *Hayut*, 352 F.3d at 750.

[26] *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 259 (6th Cir. 2000).

[27] *Galster*, 768 F.3d at 619.

[28] *Davis*, 526 U.S. at 652.

No. 14-51098

almost all of the incidents noted by Plaintiffs. In particular, Marion ISD took relatively strong action to address the most egregious incidents. After the parking lot noose incident, Marion ISD provided Plaintiffs with various accommodations, including allowing Kyana to park in the teacher's parking lot and complete school work in the counselor's office, and providing Kavin with an aide to walk her to the high school. *Cf. Watkins v. La Marque Indep. Sch. Dist.*, 308 F. App'x 781, 784 (5th Cir. 2009) (per curiam) (unpublished) (concluding that a school did not act with deliberate indifference to student's sexual harassment where it separated the student from the harasser and provided the student "with an escort at all times"). Moreover, Marion ISD cooperated with the police and FBI investigations of the incident. On other occasions, students were suspended for their misconduct, such as the student who called Kyra a "stupid nigger," and the student who hit Kavin and called her a "nigger" in 2011.

Plaintiffs contend that Marion ISD failed to take appropriate action to stop the harassment. *See Monteiro*, 158 F.3d at 1034 (stating that "a failure to act" in addressing the use of racial epithets "can only be the result of deliberate indifference."). On several occasions, Marion ISD responded to incidents of students using the word "nigger" with relatively mild punishments, such as only addressing the class about the use of the word or contacting the offending students' parents. The weakest response came with respect to the shoelace noose found in Giles's locker, where Defendant Davis only reprimanded the students in the class and ordered them to run laps. Taken together, these relatively weak responses to harassment are concerning but are not tantamount to Marion ISD intentionally "subject[ing] its students to harassment." *Davis*, 526 U.S. at 644. The Supreme Court has stated that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648; *see also Galster*, 768 F.3d at

No. 14-51098

617 ("School officials are given broad latitude to resolve peer harassment."). "Ineffective responses . . . are not necessarily clearly unreasonable." *Sanches*, 647 F.3d at 168. Because some action was taken in an attempt to address each of these issues, these incidents do not create a genuine issue of material fact as to deliberate indifference. *Cf. Rivera v. Hous. Indep. Sch. Dist.*, 349 F.3d 244, 250 (5th Cir. 2003) ("[E]ven if the Parents could show that the Board was not assiduous at fighting gang activity, this does not demonstrate that it was 'deliberately indifferent' to the danger that gang activity might have posed to [the victim].").

For the remaining incidents, the record either lacks evidence that the incidents were reported to Marion ISD, or the record is unclear whether any disciplinary action was taken. As to the former incidents, a school district can only be liable when it has "actual knowledge of the harassment." *Sanches*, 647 F.3d at 165. As to the latter incidents, there is insufficient evidence to show a genuine dispute that Marion ISD was deliberately indifferent because Plaintiffs failed to adduce evidence as to the extent of the district's responses. The record does contain, however, evidence of the additional action taken by Marion ISD as an overall response to Plaintiffs' grievances. It required its employees to attend additional training on the district's discrimination, harassment, and bullying policies, and it required students to attend a special assembly on the same topics. While Plaintiffs did not receive all of the remedies they requested through the grievance process and Marion ISD's actions did not alleviate all issues of racial harassment in its schools, "[s]chools are not required to remedy the harassment or accede to a parent's remedial demands." *Sanches*, 647 F.3d at 167–68; *cf. id.* at 170 ("Title IX does not require flawless investigations or perfect solutions."). Accordingly, the district court did not err in granting summary judgment on the Title VI claim.

No. 14-51098

## IV.   EQUAL PROTECTION CLAIMS UNDER § 1983

Plaintiffs also argue that summary judgment was improper for their equal protection claims, brought under § 1983, against Marion ISD and against Defendants Manley and Davis in their individual capacities.  "Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law."[29] *Filarksy v. Delia*, 132 S. Ct. 1657, 1661 (2012).  "Section 1983 is not itself a source of substantive rights; it merely provides a method for vindicating already conferred federal rights."  *Bauer v. Texas*, 341 F.3d 352, 357 (5th Cir. 2003).  One such federal right is conferred by the Equal Protection Clause, which prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  Accordingly, "[t]o state a claim of racial discrimination under the Equal Protection Clause and section 1983, the plaintiff 'must allege and prove that [(1) he or she] received treatment different from that received by similarly situated individuals and that [(2)] the unequal treatment stemmed from a discriminatory intent.'"  *Priester v. Lowndes Cty.*, 354 F.3d 414, 424 (5th Cir. 2004) (quoting *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001)).   To establish discriminatory intent, a plaintiff must show "that the decision maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its

---

[29] Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Defendants do not contest that they were acting under color of state law.

adverse effect on an identifiable group." *Id.* (quoting *Taylor*, 257 F.3d at 473). "Allegations [of discriminatory intent] that are merely conclusory, without reference to specific facts, will not suffice." *Id.* at 420.

As an initial matter, Defendants do not assert qualified immunity on appeal, and thus have waived this defense. *See United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010). We therefore address whether Plaintiffs have raised a genuine dispute as to each claim.

## A. Marion ISD

Plaintiffs advance two primary theories in support of their equal protection claim against Marion ISD: (1) a theory premised on alleged discriminatory customs or policies and (2) a theory premised on an alleged failure to train.[30] With respect to both theories, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 691 (1978). Accordingly, "isolated unconstitutional actions by municipal employees will almost never trigger liability," but rather "the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). "[M]unicipal liability under Section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Id.* (quoting *Monell*, 436 U.S. at 694). The policy maker is liable if an official policy itself is unconstitutional or the policy was adopted "with 'deliberate indifference' to its known or obvious

---

[30] On appeal, Plaintiffs briefly suggest that they are alleging a racially hostile environment in support of their equal protection claim against Marion ISD. However, the substance of their racially hostile environment allegations falls within their discussion of the Title VI claim. In any event, an § 1983 equal protection claim premised on such a theory requires that the district was deliberately indifferent, *see DiStiso*, 691 F.3d at 240, and therefore would suffer the same fate as the Title VI claim.

consequences." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1997)). An official policy may take "various forms," including "a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *James v. Harris Cty.*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Piotrowski*, 237 F.3d at 579). Regardless of its form, the policymaker must have actual or constructive knowledge of the official policy or custom. *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992); *see also Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) (describing the knowledge requirement for failure to train claims).

Importantly, "[t]he policymaker must have final policymaking authority." *Rivera*, 349 F.3d at 247. As Plaintiffs admit, the final policymaker here is the Marion ISD Board of Trustees, which has "exclusive policymaking authority under Texas law." *Id.*; *see also* Tex. Educ. Code Ann. § 11.151(b) ("The trustees as a body corporate have the exclusive power and duty to govern and oversee the management of the public schools of the district."). Here, the record shows that the grievances at issue were not presented to the Board until May 2012, after all the incidents described above occurred. Although the record indicates that some of the incidents were reported to Marion ISD administrators and the interim superintendent, those individuals have not been delegated policymaking authority under Texas law. *See Rivera*, 349 F.3d at 247 (noting that the plaintiffs could point to no law "empowering the Board with the authority to delegate its exclusive policymaking authority"); *Jett v. Dall. Indep. Sch. Dist.*, 7 F.3d 1241, 1251 (5th Cir. 1993) ("Under Texas law such policymaking authority rests exclusively with the [Board], and there is no evidence they had delegated it to [the superintendent]."). Thus, even assuming the alleged customs, policies, and failures to train existed among Marion ISD employees, "[t]here is no evidence that the Board knew of this behavior or

No. 14-51098

condoned it." *Rivera*, 349 F.3d at 250. In particular, while the Board may have known about three of the incidents prior to the May 2012 Board meeting,[31] those alone are not sufficient to show the board had knowledge of any discriminatory custom. *See Piotrowski*, 237 F.3d at 578 ("[I]solated unconstitutional actions by municipal employees will almost never trigger liability."). Moreover, the Board had previously implemented official policies prohibiting racial discrimination, bullying, and harassment. *Cf. Rivera*, 349 F.3d at 250 (noting that the official policies of the Board "suggest a policy that was, at minimum, antagonistic to gang-related activity"). And after the parking lot noose incident, Marion ISD instituted additional anti-discrimination and anti-harassment training facilitated by the DOJ and provided by an unaffiliated organization. *See Connick*, 131 S. Ct. at 1360 (noting that a policymaker's "policy of inaction" upon notice of a failure to train employees constitutes deliberate indifference). The district court therefore did not err in granting summary judgment as to the claim against Marion ISD under § 1983.

## B. Cynthia Manley

Plaintiffs argue that the district court erred in granting summary judgment on their equal protection claim against Defendant Manley. On appeal, Plaintiffs rely on two incidents to support this claim: (1) the April 2012 Luling bus incident and (2) the April 2012 softball field altercation.

As to the Luling bus incident, Plaintiffs have failed to show that Kyra was treated differently than similarly situated peers. Kyra signed out of school on the day of the away game and missed her remaining classes that school day. While Kyra arrived on campus prior to the scheduled departure time, there is

---

[31] There was extensive local media coverage of the parking lot noose incident; a board member had previously been informed about Coach Smith's "bad influence" comment; and Davis wrote a report to the Superintendent and the Board on the softball field altercation.

No. 14-51098

no dispute that Kyra was not present during the team's roll call. Moreover, there is no evidence in the record suggesting that Manley had ever encountered a situation in which a student signed out for lunch on a game day and failed to return in time for the team's roll call. Nor is there any evidence that she had failed to punish a student in such a situation.[32]  *See Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 213 (5th Cir. 2009) (deeming allegations "insufficient to show disparate treatment where plaintiffs have failed to allege any facts showing that [others were] similarly situated"). Plaintiffs have thus failed to show the treatment of any *similarly situated* peers, let alone that Kyra was treated differently.[33]

Plaintiffs also point to the softball field altercation several days later between Kyana and two other students. Although there is a genuine dispute as to whether the altercation was merely verbal or involved physical contact, there is no dispute that Manley did not personally observe the incident. There is also no dispute that Manley did not impose any punishment on any of the three girls, but rather told all of the participants to leave each other alone and go home. While the evidence does suggest disparate treatment because Manley suggested that only the two students, and not Kyana, file a police report, these students were not similarly situated. The undisputed evidence shows that only

---

[32] Plaintiffs contend that Manley had previously failed to discipline students who had signed out for lunch on game day, but provide no evidentiary support for that assertion.  *See Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) ("[U]nsubstantiated assertions are not competent summary judgment evidence.").

[33] The only relevant undisputed evidence in the record concerns students that, as Plaintiffs correctly note, were not similarly situated to Kyra. Even if we interpreted "similarly situated" to include these students, Plaintiffs would have failed to show that Kyra was treated differently because that evidence showed that Manley would depart from school prior to the scheduled departure time (so long as students present for roll call were on the bus), would not wait for students who were not present for roll call, and would not start students who were late and missed the bus.  *See Muhammad v. Lynaugh*, 966 F.2d 901, 903 (5th Cir. 1992) (rejecting an equal protection claim where an inmate was "no exception" to the treatment of his similarly situated peers).

No. 14-51098

those two students expressed to Manley that they were afraid of Kyana, stating that they feared that Kyana or her family would "come after them"; Kyana expressed no such concerns.   Although Manley admitted to never having previously advised students to file a police report, she also testified that she had not previously had any students fight or threaten each other.[34]   Nor is there any evidence suggesting that Manley would not have given the same instructions to Kyana had she reported that she feared the other two students.

Furthermore, there is no evidence in the record suggesting that Manley acted on the basis of race in either incident, *see Priester*, 354 F.3d at 420 ("Allegations that are merely conclusory, without reference to specific facts, will not suffice."); in fact, Kyra herself stated that Manley's actions relating to the Luling bus incident had nothing to do with race.  Thus, there is no evidence that Manley "singled out" Plaintiffs "for disparate treatment . . . in part for the purpose of causing [an] adverse effect on an identifiable group."  *Id.* at 424 (quoting *Taylor*, 257 F.3d at 473).  The district court therefore properly granted summary judgment on the claim against Manley.

## C. Glenn Davis

Plaintiffs next argue that the district court erred in granting summary judgment on their equal protection claim against Defendant Davis.  On appeal, Plaintiffs rely on two incidents to support their claim against Davis: (1) the January 2011 hairstyle incident involving Kyana and (2) the April 2012 softball field altercation.

Viewed in the light most favorable to Plaintiffs, Davis made a racially offensive comment to Kyana by stating that he "know[s] how much *you people* spend on your *ethnic* hair styles."  Such a comment is clearly indicative of racial

---

[34] Plaintiffs only provide conclusory allegations that "[they] would think" Manley had seen other altercations and that they "[didn't] think she instructed them to go file charges on those students."

No. 14-51098

animus. *See Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir. 1999), *decision clarified on reh'g*, 186 F.3d 663 (5th Cir. 1999) ("The use of an epithet is therefore strong evidence that a comment or action is racially motivated."). However, the racially offensive comment alone is insufficient to support an equal protection claim under § 1983; the comment must also be coupled with "harassment or some other conduct that deprives the victim of established rights" to constitute an equal protection violation. *Id.* Here, the evidence of Davis's racial motivation was not coupled with any disparate treatment. The incident culminated in Davis informing Kyana that she would have to change her hair color before she could continue to participate in school athletic activities. There is no dispute that Kyana's hair color was in violation of the athletic policy, and there is undisputed evidence that Marion ISD officials consistently reprimanded students of all races who violated the hair color policies, requiring those students to change their hair color.[35] Accordingly, despite Davis's racially offensive comment, there is no evidence suggesting that Kyana "received treatment different from that received by similarly situated individuals." *Priester*, 354 F.3d at 424.

Furthermore, Plaintiffs have waived any claim against Davis premised on the April 2012 softball field altercation involving Kyana. The Second Amended Complaint clearly alleges that the relevant incident underlying this claim was Davis's failure to override Manley's punishment *arising from the softball bus incident involving Kyra*, not the softball field altercation involving Kyana. Although the Second Amended Complaint alleges facts relating to Manley's handling of the softball field altercation, it includes no allegations against Davis relating to his investigation and report on the altercation. This

---

[35] Plaintiffs assert that they were aware of students with non-naturally colored hair but did not testify to any personal knowledge that those students were not reprimanded.

court has made clear that "[a] claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005). Because Plaintiffs have failed to show a genuine dispute that Davis treated Plaintiffs differently from similarly situated individuals on the only incident properly raised in the complaint, we conclude that the district court correctly granted summary judgment on the claim against Davis.

## V.    Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.